**Terry HOEPER and Dixie Hoeper, Respondents,**

v.

**Jim LILEY, et al., Appellants.**

**WD 80015**

Missouri Court of Appeals, Western District.

Opinion filed: August 29, 2017

M. Courtney Koger, Kansas City, for Respondents.

Kenneth C. Hensley, Raymore, for Appellants.

Before Division Two: Edward R. Ardini, Jr., Presiding Judge, Karen King Mitchell, Judge and Anthony Rex Gabbert, Judge

## EDWARD R. ARDINI, JR., JUDGE

Jim Liley and Vicki Liley appeal the judgment of the Circuit Court of Bates County awarding $190,509.96 to Terry Hoeper and Dixie Hoeper out of the proceeds from the sale of land in a partition action. The award includes the Hoepers' proportional share of the proceeds relating to their ownership in the land as well as reimbursement for improvements and taxes paid on the land, awards relating to two separate claims for unjust enrichment, and attorney's fees and costs. Finding no error, we affirm.

### Factual and Procedural Background

This case concerns the partition of two parcels of land, as well as claims for unjust enrichment relating to two unrelated parcels of land, all arising out of a dispute among family members.[1] The underlying suit was brought by Terry Hoeper and his wife Dixie Hoeper (collectively "the Hoepers"). Terry Hoeper is the brother of

---

1. There was an additional claim for defamation that was dismissed prior to trial and is not the subject of this appeal.

Vicki Liley who is married to Jim Liley (collectively "the Lileys"), the defendants in the underlying suit. Terry Hoeper and Vicki Liley's parents were Doris Hoeper and Richard Hoeper, both now deceased. Richard Hoeper died intestate in 1997, Doris Hoeper died intestate in 2000. Sam Hoeper is Richard Hoeper's brother and the uncle of Terry and Vicki.[2]

At one point, the collective Hoeper/Liley family owned several parcels of land. The Strip-Pit is a parcel of real property in Bates County consisting of 160 acres originally acquired by Richard and Sam in a lawsuit against a local mining company. The Bottom-Land is a parcel of real property in Bates County consisting of 80 acres that was originally purchased by Richard Hoeper. Adjacent to the Bottom-Land is an unnamed 94 acre parcel that was originally acquired by the parents of Richard and Sam. The Nevada House is real property with a residence built upon it located in neighboring Vernon County that was originally purchased by Sam and resided in by Doris and Richard until their death. The Home Farm is a piece of property in Bates County first owned by Richard and Sam's parents. Finally, the Tipple Parcel is a piece of real property also located in Bates County.

Prior generations of Hoepers had left the ownership of the various properties in disarray. While the family often spoke of inheritances, in reality many of the properties had been transferred by gift with names being placed on or added to the different parcels. In addition, many of the prior generations had died intestate further complicating matters. As a result, several of the parcels had multiple family members' names on their titles. Richard's

50% interest in the Strip-Pit and 100% interest in the Bottom-Land had been transferred to the Hoepers and the Lileys as tenants in common by warranty deed so that upon his death the Hoepers and the Lileys each owned a 25% interest in the Strip-Pit and a 50% interest in the Bottom-Land with Sam owning the remaining 50% of the Strip-Pit. At the same time, both the Lileys and the Hoepers inherited their father's interest in the 94 acres of unnamed land adjacent to the Bottom-Land that was also owned in part by Sam. In addition, though the Hoepers had purchased Richard and Doris's interest in the Home Farm in the 1970's, Sam retained a 1/12 share in the property. Finally, at some point, Richard, Doris, and Vicki had all been added to the title to the Nevada House alongside Sam so that after Richard and Doris passed away the Nevada House was owned by both Sam and Vicki, apparently as tenants in common. Only the Tipple Parcel appears to have been left clean, title having been passed some years earlier to the Lileys.

Prior to his death, Richard Hoeper had commenced a lawsuit against his brother Sam to clear up the convoluted ownership interests of the various properties. While the parties reached a tentative settlement in that suit, Sam failed to complete the agreement or remove his name from the properties as needed before Richard's death. As a result, the Hoepers went to court to pursue the claims against Sam.[3] Terry asked Vicki to join in this litigation. Although she told Terry that she was "on his side," she refused to financially contribute toward the costs or legal fees. After spending approximately $53,000 in legal

---

**2.** The use of first names is strictly for the purpose of ease of reference. No familiarity or disrespect is intended.

**3.** It is unclear from the record whether the Hoepers joined and continued the existing action first initiated by Richard or instigated a new action in their own name.

fees, the Hoepers reached a settlement with Sam. Consistent with the resolution, Sam transferred his 50% interest in the Strip-Pit to the Hoepers, released his claim on the Home Farm in favor of the Hoepers, and transferred by quitclaim deed his interest in the Nevada Home to Vicki. In exchange, the Hoepers and the Lileys released their respective interests in the unnamed 94 acre parcel. Therefore, at the time of the filing of this action, the parties' interests in the properties were divided as thus: the Strip-Pit Parcel was owned 75% by the Hoepers, 25% by the Lileys with the subsurface mineral rights being held by Heritage Coal LLC;[4] the Bottom-Land was owned 50% by the Hoepers and 50% by the Lileys; the Nevada House was owned solely by the Lileys; the Home Farm was owned in its entirety by the Hoepers; and the 94 acres of land in an unnamed parcel adjacent to the Bottom-Land was owned by Sam.

Sometime in 2007 or 2008, the Hoepers decided to end the joint ownership of the Strip-Pit and Bottom-Land properties with the Lileys, which the Lileys admitted to knowing of by at least 2008. Despite this, the Lileys made no attempt to discuss the matter with the Hoepers or to resolve the issue by means other than partition. Undeterred, the Hoepers sent the Lileys a proposal for how to resolve the issue of joint ownership that included a proposed method of appraising the two parcels and giving the Lileys the first right to purchase one or both of the parcels. Vicki responded by quitting her job at a company owned by the Hoepers and telling Terry, "I guess the next time I see you will be in court."

In November of 2011, the Hoepers initiated the present action seeking partition and/or sale of the Strip-Pit and Bottom-Land parcels. The Hoepers' petition included a request that they be reimbursed from the proceeds of the sale for expenses incurred on both parcels relating to maintenance done, improvements made, and taxes paid. In addition, the Hoepers included a claim for unjust enrichment against the Lileys related to the Hoepers prior work on resolving the issue of ownership of the Nevada House and a separate claim for unjust enrichment relating to taxes paid and improvements made to the Tipple Parcel.[5] Finally, the Hoepers also filed a request for attorney's fees pursuant to section 528.530 and Rule 96.30.[6]

 During the course of the partition action, a licensed real-estate agent contacted the Hoepers regarding offers to purchase the Bottom-Land parcel for $152,000 and $132,000 less commission. Terry Hoeper also found a buyer willing to purchase the Bottom-Land parcel for $200,000 in a sale that would not require the payment of a commission. All of these offers were communicated to the Lileys who, on each occasion, failed to respond. With the efforts to avoid a partition having

---

**4.** The Hoepers identified Heritage Coal LLC as the owner of the mineral rights to the Strip-Pit and negotiated an agreement with them to deed those rights to the ultimate purchaser of the land in exchange for their dismissal from the partition action. While this action was pending, Heritage Coal filed for bankruptcy, and the Hoepers filed a claim in that bankruptcy proceeding to enforce the agreement. Heritage Coal ultimately transferred its rights in the Strip-Pit to the Hoepers after the Hoepers purchased the parcel outright at the sheriff's sale.

**5.** This second claim for unjust enrichment was accompanied by a claim for breach of contract relating to a supposed contract between the Hoepers and the Lileys regarding the farming and maintenance of the Tipple Parcel.

**6.** All statutory citations are to the Revised Statutes of Missouri, 2000, as supplemented; all rule citations are to Missouri Supreme Court Rules (2017) unless otherwise noted.

failed, the Hoepers moved to proceed to a sheriff's sale without incurring the expense of commissioners.[7] The Lileys however insisted on having commissioners appointed, although their counsel acknowledged the unlikelihood of the land being deemed divisible under Chapter 528. The Hoepers undertook to find qualified commissioners and helped with their visit to the properties, both tasks the Lileys refused to assist with. The commissioners ultimately determined that the land could not be divided, which the Lileys did not challenge. The trial court ordered a sheriff's sale that was held on March 23, 2013. The Bottom-Land was sold for $120,000 to the same party who had previously offered $200,000 for the property. The Strip-Pit was purchased by the Hoepers for $350,000.[8]

A trial was scheduled for November 26, 2013, to resolve the remaining claims and determine the distribution of the proceeds. However, the Lileys and their counsel failed to appear for trial that day. The Hoepers, who did appear and who were ready for trial, filed a supplemental application for attorney's fees relating to work performed in preparation of that trial date. The trial was ultimately held on December 20, 2013. Following the trial, the court awarded the Hoepers $60,000.00 for their 50% ownership in the Bottom-Land as well as $985.74 for the taxes they paid on the Bottom-Land and Strip-Pit parcels and $26,973.63 for improvements made to the Bottom-Land and Strip-Pit parcels from the proceeds of the partition sale. The trial court also found in favor of the Hoepers on their two counts of unjust enrichment and awarded them $20,000.00 on their claim relating to their work resolving the issue of ownership of the Nevada House and $3,294.42 on their claim for work done and taxes paid on the Tipple Parcel. Finally, the trial court awarded the Hoepers $74,185.83 for attorney's fees and costs and returned their $2,000.00 deposit for costs. The trial court's award of attorney's fees included $24,830.33 in ordinary fees and costs and $49,355.50 in extraordinary fees that the trial court awarded based on the Lileys' vexatious conduct during the action. An additional $3,070.34 in attorney's fees was awarded by supplemental order pertaining to the Hoepers' request related to the November 26 trial date, bringing the total judgment for the Hoepers to $190,509.96. The Lileys now appeal the trial court's award of $26,973.63 for improvements to the Bottom-Land and Strip-Pit parcels, the award of $20,000.00 on the Hoepers' claim for unjust enrichment relating to their work resolving the issue of ownership of the Nevada House, and the initial award of $74,185.83 in attorney's fees and costs.[9]

---

7. A partition by division in kind is favored over a sale of the property and will be the method used unless the court finds that it results in prejudice to the owners. *Von Behren v. Oberg*, 902 S.W.2d 338, 340 (Mo. App. E.D. 1995). The test for whether a partition in kind would prejudice the owners "is whether or not the value of the share of each, after partition, would be materially less than the share of the money" each would receive from a sale of the whole. *Id.* To help in making this determination, the trial court is permitted to appoint three commissioners under Rule 96.12. These commissioners "divide the lands and tenements, and allot the several portions and shares thereof to the respective parties, quantity and quality relatively considered by them." § 528.260. "If the commissioners find they are unable to partition the property in kind without great prejudice to the parties, their sole alternative is to inform the court that they are unable to accomplish its directive." *Oberg*, 902 S.W.2d at 340–41. The trial court may then order the sale of the property. *Id.*

8. Because they owned 75% of the Strip-Pit, the Hoepers paid to the Sherriff only $87,500 or 25% of the purchase price.

9. The Lileys do not appeal the trial courts supplemental order awarding $3,070.34 in attorney's fees.

## Attorney's Fees

▉ The Lileys' first point on appeal contends that the trial court's award of $74,185.83 in attorney's fees to the Hoepers was excessive and constituted error. We review a trial court's award of attorney's fees for an abuse of discretion. *Berry v. Volkswagen Group of America, Inc.*, 397 S.W.3d 425, 430 (Mo. banc 2013). "To demonstrate an abuse of discretion, the complaining party must show the trial court's decision was against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *Howard v. City of Kansas City*, 332 S.W.3d 772, 792 (Mo. banc 2011) (quoting *Russell v. Russell*, 210 S.W.3d 191, 199 (Mo. banc 2007)). "The trial court is considered an expert on fees, given its familiarity with all of the issues in the case and with the character of the legal services rendered," and "may determine attorney fees without the aid of evidence." *Soto v. Costco Wholesale Corp.*, 502 S.W.3d 38, 55 (Mo. App. W.D. 2016) (quoting *Walsh v. City of Kansas*, 481 S.W.3d 97, 113 (Mo. App. W.D. 2016)). In this case, the $74,185.83 in attorney's fees and costs awarded by the trial court can be broken down into three distinct amounts: $22,728.00 in ordinary fees, $49,355.50 in extraordinary fees, and $2,102.33 in costs. We will review these awards separately.

▉ Section 528.530 and Rule 96.30 both permit trial courts to award "a reasonable fee to the attorney instituting the action" in a partition proceeding. *Turner v. Pence*, 514 S.W.3d 98, 109 (Mo. App. W.D. 2017). Courts have recognized that "[b]e-

cause both parties benefit from the work of the attorney who handles the partition case (i.e. both receive partition sale proceeds), the defendant 'should not be permitted to escape the common burden, and throw upon the plaintiff the whole of it.' " *Tadych v. Horner*, 336 S.W.3d 174, 180 (Mo. App. W.D. 2011) (quoting *Arthaud v. McFerrin*, 156 S.W.2d 641, 642 (Mo. 1941)). Therefore, courts permit the attorney responsible for bringing the action to be compensated "out of the common fund realized from the sale of the property." *Higgins v. Olson*, 991 S.W.2d 216, 219 (Mo. App. E.D. 1999). However, because this compensation is "predicated on the theory that the attorney who instituted the partition action acts on behalf of both parties," it is generally "limited to 'such work as would be required in an uncontested suit.' " *Horner*, 336 S.W.3d at 180 (quoting *McFerrin*, 156 S.W.2d at 642).

▉ In the present case, the trial court awarded $22,728.00 in ordinary fees pursuant to the statute and rule.[10] This amount is less than the $66,443.50 that the Hoepers originally requested and, despite the Lileys' incredulity, is not on its face so arbitrary and unreasonable as to shock this court's sense of justice. The Lileys' sole argument with regard to this amount seems to be that the fee is disproportional to the value of the land; however, this contention is not borne out by the facts. The final sale price of the Strip-Pit and Bottom-Land were $350,000 and $120,000 respectively, for a total of $470,000. The $22,728.00 in ordinary fees represents ap-

10. The $22,728.00 can be further broken down as follows: $2,718.50 research and research analysis; $2,331.00 preparation and review of pleadings; $724.50 correspondence and investigation on mineral rights; $94.50 amending petition to name Heritage Coal; $126.00 Heritage summons and answer-related work; $661.50 Heritage motion to dismiss related work; $441.00 Heritage bankruptcy work; $1,633.00 quitclaim deed work (Heritage); $1,071.00 correspondence regarding offers; $10,632.00 work related to commissioners, title issues, preparation of documents for sheriff's sale; $1,512.00 attendance at sale; $1,323.00 closing/title insurance work.

proximately 5% of this total sale price and hence is not disproportionately large.[11] *See Hunkler v. Wilke*, 444 S.W.2d 507, 509 (Mo. App. 1969) (Award of approximately 5% for attorney's fees in partition action found not to be an abuse of discretion.). The same considerations hold true for the $2,102.33 in costs as well, in that we do not find the amount to be shocking or arbitrary on its face and the Lileys have provided no arguments to the contrary.[12] As a result, neither the award of $22,728.00 in ordinary fees nor the award of $2,102.33 for costs constituted an abuse of discretion by the trial court.

■■■ It is readily apparent that the real *raison d'être* of the Lileys' first point on appeal is the trial court's award of $49,355.50 in extraordinary fees.[13] The trial court made this award because it found that the Lileys and their counsel had been vexatious and unduly litigious throughout the course of the partition action. In so doing, the trial court was relying on the longstanding exception to the rule limiting attorney's fees in partition actions to those that would be awarded in an uncontested suit. *Tadych v. Horner*, 336 S.W.3d 174, 180 (Mo. App. W.D. 2011) ("[Attorney's] fees are typically limited to such work as would be required in an uncontested suit.

An exception to this rule exists where the defendant is uncooperative and unduly litigious in his opposition to the partition action.") (internal citations omitted) (quoting *Nelson v. Hotchkiss*, 601 S.W.2d 14, 21 (Mo. banc 1980)); *Turner v. Pence*, 514 S.W.3d 98, 109 (Mo. App. W.D. 2017) (same). In particular, the trial court relied on the case of *Munday v. Thielecke* in which our Supreme Court upheld an award of substantial attorney's fees because it found the underlying defendants in a partition action were the "principal cause of making the work in [the] case very difficult and of making the case vexatious for the court and for the attorneys for plaintiff and appellant." *Munday v. Thielecke*, 290 S.W.2d 88, 90 (Mo. 1956).

There is substantial evidence to support the trial court's conclusion that the Lileys behaved in a manner sufficiently egregious to permit the awarding of extraordinary fees. In issuing its judgment, the trial court found as follows:

> Here, the Hoepers have incurred substantial attorney's fees and costs because of the vexatious and obstructive actions of the Lileys and their counsel [ ]. Indeed, the Lileys and [counsel] acted vexatiously even where the Hoepers

---

11. The Lileys' contention that the award is disproportionally large would appear to be based on their comparison of the amount awarded in attorney's fees against the $211,500.00 held by the trial court for distribution at the time of the trial. This $211,500.00 represents the amount paid to the sheriff at the partition sale ($120,000 for the Bottom-Land parcel and the $87,500 of the $350,000 purchase price for the Strip-Pit parcel paid by the Hoepers given their existing 75% ownership interest) plus $2,000 each from both the Lileys and the Hoepers paid as a deposit for costs. This $211,500.00 does not represent the value of the land and thus is an incorrect metric against which to measure the award of attorney's fees.

12. The $2,102.33 in costs can be further broken down as follows: $15.00 recorder of deeds of Bates County, $983.70 deposition transcripts, $513.55 mileage, $128.00 filing fees, $263.40 photocopies and scans, $12.00 facsimile, $65.52 Federal Express, $60.00 service of process fees, $61.16 postage.

13. The $49,355.50 can be further broken down as follows: $7,371.50 conferences and correspondence, $7,988.00 preparation/review non-sale-related motions and orders, $9,711.50 discovery and depositions, $12,959.00 trial preparation and trial motions, $5,145.50 other appearances and hearings, $6,180.00 trial (12 hours each for a partner at $315 and an associate at $200 per hour).

sought to benefit both parties. For example, despite no dispute about the percentages of ownership in the subject parcels of land in this action, the Lileys, like the underlying defendants in *Munday*, refused to engage in settlement discussions, including prior to suit being filed. The Lileys continued to refuse to engage in settlement discussions after the Hoepers filed suit. Instead, the Lileys and their counsel engaged in a pattern and practice of obstructing the efficient disposition of the subject parcels and other claims between the parties. The Lileys required the Hoepers to file a motion for default judgment, and to have their counsel appear in court, just to get them to answer the petition. The Lileys refused to assist in finding qualified commissioners. When confronted with a motion to appoint commissioners, their counsel indicated that they might consent to proceed directly to sheriff's sale. However, despite counsel's acknowledgement that it was highly unlikely that any commissioners would report that the two parcels could be divided, no consent was forthcoming. The Hoepers had to file a motion asking the Court to enter an order either appointing commissioners or ordering a sale; counsel for the Lileys waited until the Friday before the hearing on the motion to consent to appointment. The Lileys also did none of the work to assist in partition sale but refused all request to negotiate any settlement involving the proceeds of the sale. They unilaterally attempted to cancel a pretrial hearing despite the fact that there were issues that the Court needed to take up, thus costing yet more in fees to the Hoepers when they had to oppose the attempt. In addition, there were countless efforts by the Hoepers' counsel to work with the Lileys' counsel—on matters like settlement negotiations, stipulations of fact, to narrow issues for trial, appointment of commissioners, getting an order entered,—where the Lileys, through their counsel, refused to respond or cooperate.

The Lileys do not contest *any* of these findings in their brief. Rather, they assert that it would be unfair and inequitable for the court to award fees based on their vexatious or litigious conduct because, at the time the suit was filed, the Hoepers made a claim against them for defamation of character. The Lileys argue that the filing of the defamation claim and the negotiations surrounding it made it difficult, if not impossible, to reach a resolution on the remaining claims in the partition action. However, even if we were to accept the Lileys' argument as true, it would not explain or excuse the behavior of the Lileys with regard to such actions as failing to file an answer until threatened with default judgment, refusing to consent to sale without commissioners despite acknowledgement that the parcels could not be divided, refusal to assist in finding commissioners, failing to assist in the partition sale, or attempting to cancel a necessary pretrial hearing. The only other argument the Lileys offer to demonstrate that the award of extraordinary attorney fees was unreasonable is to again claim that the fees are disproportional to the value of the land. Even if we include the award of ordinary fees and costs, however, the total award of $74,185.83 is approximately 15.8% of the total sale price of the parcels. This amount is nearly identical to the 16% in attorney's fees upheld by the *Munday* court. *Munday*, 290 S.W.2d at 92.

The Lileys' actions throughout the course of this litigation added undue hardship to what should have been a relatively simple affair. Their obstructionist behavior and refusal to cooperate with the Hoepers

cost the parties $80,000 (the difference between the highest offer for the Bottom-Land and the ultimate purchase price at auction) and prevented the action from being completed prior to the owner of the mineral rights to the Strip-Pit declaring bankruptcy, thus forcing the Hoepers to intervene in the bankruptcy proceeding. The Lileys unwillingness to timely respond to matters raised by opposing counsel required the Hoepers to appear before the trial court multiple times to demand action on what should have been routine matters and created unnecessary delays. As noted in *Munday*, "[the Lileys] wanted to fight and [their] wishes were carried out. The time has come to pay the fiddler. [The Lileys have] listened to the music [they] ordered and should not be allowed to complain about paying the bill." *Id.* There is no basis to conclude that the trial court abused its discretion in awarding $74,185.83 in attorney's fees and costs to the Hoepers. The Lileys' first point is denied.

### Unjust Enrichment

The Lileys' second point on appeal concerns the trial court's award of $20,000 to the Hoepers on their claim for unjust enrichment based on their efforts in the litigation with Sam, which provided the Lileys sole ownership to the Nevada House. The Hoepers brought this claim seeking reimbursement for some portion of the $53,000 in legal fees they incurred in that prior suit, undertaken with the intent of settling the issues regarding ownership of the various family properties that had arisen over the years. The Lileys argue that the trial court erred in making this award because there was not substantial evidence presented to show that a benefit worth $20,000 was conferred. Because this was a court-tried action, it is reviewed under the standard announced in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *Turner v.*

*Pence*, 514 S.W.3d 98, 103 (Mo. App. W.D. 2017). Consequently, we will affirm the judgment "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.* When reviewing a court tried case, we view "all evidence and inferences therefrom in the light most favorable to the prevailing party and disregard[ ] all contrary evidence." *Id.*

In order to prevail on a claim of unjust enrichment, a plaintiff must demonstrate that: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances." *Binkley v. American Equity Mortgage, Inc.*, 447 S.W.3d 194, 199 (Mo. banc 2014) (quoting *Hargis v. JLB Corp.*, 357 S.W.3d 574, 586 (Mo. banc 2011)). As stated, the Lileys' point relied on would appear to challenge only the first of these three elements by claiming that there was no evidence to show the conferring of a benefit. However, the arguments made in the Lileys' brief seem to concern solely the third element as they all relate to why it would not be inequitable for the Lileys to retain the benefit. "Claims of error raised in the argument portion of a brief that are not raised in the point relied on are not preserved for our review." *C.S. v. Missouri Department of Social Services*, 491 S.W.3d 636, 656 (Mo. App. W.D. 2016) (quoting *Holliday Investments, Inc. v. Hawthorn Bank*, 476 S.W.3d 291, 297 n. 5 (Mo. App. W.D. 2015)). However, this court will, *ex gratia*, exercise its discretion to consider the merits of the arguments made by the Lileys despite the failing of their brief to properly state their point relied on. *See Scott v. King*, 510 S.W.3d 887, 892 (Mo. App. E.D. 2017).

Prior to the Hoepers commencing the previous action to clean up the ownership of the family properties, both Vicki Liley and Sam Hoeper were named on the deed to the Nevada House. After incurring nearly $53,000 in legal fees, to which the Lileys contributed nothing, the Hoepers managed to procure a global resolution between the relevant parties. As part of this agreement, Sam transferred his interest in the Nevada House to Vicki by quitclaim deed, giving the Lileys sole ownership, and they, in turn, released their interest in the unnamed 94 acre parcel located adjacent to the Bottom-Land.[14]

■ There was substantial evidence to support the trial court's finding that the Lileys received a benefit as a direct result of the Hoepers' work in the earlier litigation. The Lileys valued the Nevada House at $61,681 on their tax return for 2005, before they had full ownership of the property. They proceeded to claim depreciation for the Nevada House as 100% owners from 2005 to 2010 until it was sold in 2011 for $49,000. The Lileys received and retained all of the proceeds from the sale of the house as well as the sale of many of the items of personal property left in the house. Their ability to claim depreciation on the Nevada House as 100% owners and retain all proceeds from its sale is the direct result of having obtained sole ownership of the Nevada House, which itself was the direct result of the prior lawsuit brought and resolution obtained by the Hoepers. Thus, the Lileys clearly received a significant benefit that was conferred upon them by the Hoepers. As previously stated, it appears that the Lileys do not challenge this conclusion. In fact, their brief would seem to implicitly admit that

fact in arguing that it would not be inequitable or unjust for them to retain the benefit without compensating the Hoepers. Having found that there was substantial evidence to support the trial court's finding that the Lileys received a benefit as a direct result of the Hoepers' efforts to clean up ownership of the family properties, we now turn to the Lileys' argument that it would not be inequitable or unjust for them to retain the benefit without compensating the Hoepers.

■ The Lileys first argue that it would not be inequitable for them to retain the benefits that flowed from the global settlement in the lawsuit initiated by the Hoepers against Sam because the Hoepers also benefited from the settlement. Though the Lileys fail to direct this Court to any authority for this proposition, we do note that at least one Missouri case exists to support the conclusion that "[r]ecovery for unjust enrichment is unavailable if the benefits to the [defendants] were created incidentally by the [plaintiffs] in pursuit of their own financial advantage." *JB Contracting, Inc. v. Bierman*, 147 S.W.3d 814, 820 (Mo. App. S.D. 2004) (quoting *Hettinga v. Sybrandy*, 126 Idaho 467, 886 P.2d 772, 776 (1994)). However, that is plainly not the case here. The Hoepers had no interest in the Nevada House prior to the commencement of the lawsuit against Sam nor did they seek one during the lawsuit. Thus, in working to have Sam relinquish his interest in the Nevada House, the Hoepers were acting solely in the interest of the Lileys and not in pursuit of their own financial advantage. The fact that the Hoepers received a separate benefit in the same lawsuit is irrelevant.

14. The agreement also required Sam to release his 1/12 claim in the Home Farm in favor of the Hoepers and deed the Hoepers his 50% share of the Strip-Pit in exchange for the Hoepers releasing their interest in the unnamed 94 acre parcel adjacent to the Bottom-Land.

The Lileys also argue that they should receive a presumption that the benefit was conferred gratuitously owing to the familial relationship between the Lileys and the Hoepers. The Lileys correctly argue that "the existence of a family relationship, once it is established, gives rise to a presumption that services rendered were intended to be gratuitous." *McMurry v. Magnusson*, 849 S.W.2d 619, 622 (Mo. App. E.D. 1993). However, this "defense of family relationship" is an affirmative defense and, as such, the defendants bear the burden of proof. *Id.*; *Jaycox v. Brune*, 434 S.W.2d 539, 544 (Mo. 1968) ("The defense of a family relationship is an affirmative defense and should be pleaded; and the defendant has the burden of proving it.") *abrogated on other grounds by State ex rel. Leonardi v. Sherry,* 137 S.W.3d 462 (Mo. banc 2004). Here the Lileys did not plead the affirmative defense of family relationship or make any attempt to argue to the trial court that they were entitled to a presumption that the services rendered by the Hoepers were gratuitous on those grounds. It is well-established law that "[a] defendant must plead his affirmative defenses in his answer to the suit or they will be deemed waived." *Wilmes v. Consumers Oil Co. of Maryville*, 473 S.W.3d 705, 716 (Mo. App. W.D. 2015) (quoting *Peterson v. Discover Prop. & Cas. Ins. Co.*, 460 S.W.3d 393, 411 (Mo. App. W.D. 2015)). The purpose of this pleading requirement is "to ensure that an opposing party is informed of and prepared to address the issues being raised by the defense." *Dieser v. St. Anthony's Medical Center*, 498 S.W.3d 419, 429 (Mo. banc 2016). Consequently, we will not entertain an affirmative defense raised for the first time on appeal. *Murphy v. Jackson Nat. Life Ins. Co.*, 83 S.W.3d 663, 667 (Mo. App. S.D. 2002); *Lamont v. Lamont*, 922 S.W.2d 81, 85 n. 1 (Mo. App. W.D. 1996).

The trial court's judgment for the Hoepers on their claim of unjust enrichment was supported by substantial evidence. None of the arguments raised by the Lileys support either the claim made in their point relied on that no benefit was conferred or the argument made in their brief that it was not inequitable for them to retain that benefit without compensating the Hoepers.[15] On the contrary, the record makes clear that the Lileys appreciated a substantial financial benefit from a lawsuit for which the Hoepers incurred a significant financial burden, all the while knowing that the Hoepers had requested financial assistance. As such, it is not unreasonable for the Lileys to now be required to shoulder a part of that burden. The Lileys second point on appeal is denied.

## Improvements to the Land

The Lileys third point on appeal alleges that the trial court erred in award-

---

15. In addition to the arguments already discussed, the Lileys argue that it was equitable for them to obtain sole ownership of the Nevada House without compensating the Hoepers because no attempt was made to make Vicki Liley a party to the lawsuit. That the Lileys would make this contention is perplexing given that Vicki, by her own testimony, admitted that Terry asked her to join in the litigation against Sam. Moreover, though not a named party to the suit, the Lileys did join in the settlement that concluded it. The Lileys also argue that they should not have to reimburse the Hoepers because the settlement agreement reached in the lawsuit between the Hoepers and Sam indicated that both sides would be responsible for paying their own attorney's fees. However, the agreement to which the Lileys refer has not been made a part of the record, and even if it were, they offer no explanation as to how an agreement that the Hoepers would not seek payment for attorney's fees from Sam would translate into an agreement not to seek reimbursement from the Lileys.

ing $26,973.63 to the Hoepers for improvements made to the Bottom-Land and Strip-Pit parcels. We again review under the standard announced in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976) and will affirm the judgment "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Turner v. Pence*, 514 S.W.3d 98, 103 (Mo. App. W.D. 2017).

"It is well settled that in a partition proceeding, the parties are entitled to reimbursement for expenditures with respect to the property for taxes, insurance and necessary repairs and improvements." *Hoit v. Rankin*, 320 S.W.3d 761, 774 (Mo. App. W.D. 2010) (quoting *Clark v. Dady*, 131 S.W.3d 382, 390 (Mo. App. W.D. 2004)). "[R]eimbursement is available where [expenditures] are made in good faith, are of a necessary and substantial nature, materially enhance the value of the property, and the circumstances show that it would be equitable to do so." *Id.* (quoting *Dady*, 131 S.W.3d at 390); *Hartog v. Siegler*, 615 S.W.2d 632, 636 (Mo. App. E.D. 1981) ("Upon partition, advances for repairs made in good faith for the substantial benefit of all co-tenants, may be allowed.")

In this case, the trial court found that the Hoepers had expended substantial funds repairing and improving the Bottom-Land and Strip-Pit parcels.[16] The trial court further found that these actions were necessary to maintain and to improve the land for farming and were done with a purpose of enhancing the value. The Lileys argue that the improvements made by the Hoepers were merely routine upkeep related to the farming of the land and did not enhance its value. However, this argument is directly at odds with precedent and consequently lacks merit. *See Siegler*, 615 S.W.2d at 635-36. (The Eastern District upheld a trial court's judgment in a partition of 126 acres of farmland which reimbursed the plaintiff for expenditures including fencing and materials, excavation work, grain and seed, fertilizer and lime, and building supplies finding that the expenditures were necessary for the maintenance and repair of the property); *Goforth v. Ellis*, 300 S.W.2d 379, 384 (Mo. 1957) (Supreme Court of Missouri found it was equitable for the plaintiff in a partition action to pay a portion of the costs to repair a basement wall as the evidence showed the repairs were necessary not only to preserve the house but also to prevent greater damage to it). As a result, it was proper for the trial court to reimburse the costs incurred by the Hoepers to maintain the land in a farmable condition out of the proceeds of the partition sale. *Siegler*, 615 S.W.2d at 635-36; *Rankin*, 320 S.W.3d at 774; *Dady*, 131 S.W.3d at 390.

The Lileys next argue that the Hoepers should not be entitled to receive any reimbursement for the work done on the Bottom-Land and Strip-Pit parcels because the Hoepers received all of the benefits from farming these parcels. It is well recognized that "[o]n partition of property held in co-tenancy, an occupying co-tenant may claim reimbursement for advances made for the benefit of the commonly held property; including repairs, taxes and insurance, and his co-tenant will be entitled

---

**16.** Improvements to the Bottom-Land parcel included maintaining the road/easement, rebuilding a gate, dozer work on the fence line, maintaining the waterways for farming, spraying chemicals, mowing, and applying lime and fertilizer. Improvements to the Strip-Pit parcel included mowing, spraying chemicals, applying lime and fertilizer, removing brush, rebuilding a washed out dam, blading roads, and building and maintaining terraces.

to set off against such claims rents and profits for the period of his occupation." *Siegler*, 615 S.W.2d at 637. However, the Lileys' argument is misplaced as the record confirms that the Hoepers, rather than seeking the entire cost of the maintenance and improvements to the Bottom-Land and Strip-Pit parcels, requested an amount reduced by the farming proceeds they had received during the relevant period. In turn, the $26,973.63 awarded by the trial court accounted for the farming-related revenue realized by the Hoepers and was thus in accord with Missouri law. The Lileys' third point on appeal is denied.

## Conclusion

The judgment of the trial court is affirmed.

All concur.